UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| SHEILA D. ROSS | * | CIVIL ACTION NO. 09-0294 |
| VERSUS | * | MAG. JUDGE KAREN L. HAYES |
| MICHAEL J. ASTRUE,<br>COMMISSIONER, SOCIAL<br>SECURITY ADMINISTRATION | * | |

## MEMORANDUM RULING

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. Pursuant to 28 U.S.C. § 636(c)(1) and with the consent of all parties, the district court referred the above-captioned matter to the undersigned magistrate judge for the administration of proceedings and entry of judgment. For the reasons assigned below, the decision of the Commissioner is **REVERSED** and the matter **REMANDED** for further proceedings.

### Background & Procedural History

On January 10, 2006, Sheila Ross[1] protectively filed the instant applications for Title XVI Supplemental Security Income payments and Title II Disability Insurance Benefits. (Tr. 59-61, 76, 412-414). She alleged disability since April 15, 2002,[2] because of major depression, carpal tunnel syndrome, severe back pain, cervical spine impairment, and soft tissue injuries of the arm that required multiple procedures. (Tr. 70-71). The state agency denied the claims at the initial stage of the administrative process. (Tr. 42-47). Thereafter, Ross requested and received an

---

[1] Referred to as "Shelia Ross" throughout most of the administrative record.

[2] Ross subsequently amended her disability onset date to August 1, 2004. (Tr. 464).

April 11, 2007, hearing and a November 21, 2007, supplemental hearing before an Administrative Law Judge ("ALJ"). (Tr. 448-460, 461-475). However, in a February 26, 2008, written decision, the ALJ determined that Ross was not disabled under the Social Security Act, finding at Step Five of the sequential evaluation process that she was able to make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 15-29). Ross appealed the adverse decision to the Appeals Council. Nonetheless, on January 5, 2009, the Appeals Council denied Ross's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 6-8).

On February 23, 2009, Ross sought review before this court. She alleges that the ALJ's residual functional capacity assessment is not supported by substantial evidence because he failed to properly weigh the medical source opinions or to properly evaluate the claimant's credibility.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court

may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

    (1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

    (2)    An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

    (3)    An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

    (4)    If an individual's residual functional capacity is such that he or she can

    still perform past relevant work, then a finding of "not disabled" will be made.

 (5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See, Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

### I. Steps One, Two, and Three

  The ALJ determined at Step One of the sequential evaluation process that Ross did not engage in substantial gainful activity during the relevant period. (Tr. 20). At Step Two, he found that Ross suffers severe impairments of cervical and lumbar degenerative disc disease, bilateral carpal tunnel syndrome, hypertension, major depression, personality disorder, general anxiety disorder, and panic disorder. (Tr. 20). He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process. (Tr. 22).

### II. Residual Functional Capacity

The ALJ next determined that Ross retained a residual functional capacity for light work[3] limited by "no more than occasional bending, stooping, kneeling, crouching or crawling, occasional overhead reaching with the left upper extremity with constant, not frequent handling, a sit/stand option, marked limitations in the ability to understand, remember and carry out complex instructions and make judgments on complex work-related decisions and moderate limitations in the ability to interact appropriately with the public, supervisors and co-workers and respond appropriately to usual work situations and to changes in a routine work setting. Marked is defined as serious limitations. Moderate is defined as satisfactory." (Tr. 24).

Plaintiff challenges the sufficiency of the ALJ's residual functional capacity assessment on the basis that the ALJ improperly credited the findings of a non-examining medical expert over the findings of her treating psychologist.[4]  Plaintiff's argument is well-taken.

    a)    <u>Pertinent Medical History</u>

The genesis of plaintiff's asserted disability is a slip and fall accident that occurred in December 2001 at Burger King – her place of employment. According to the medical record,

---

[3] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

[4] For purposes of this appeal, plaintiff focuses upon the limitations stemming from her mental impairments.

Ross landed on her left shoulder, elbow, and lower back. (Tr. 182). In April 2002, she underwent left shoulder arthroscopy and physical therapy follow-up. *Id*. By November 2002, however, her symptoms failed to resolve, thus, her orthopedist referred her to Douglas Brown, M.D., for a second opinion. *See* Tr. 143-144. Dr. Brown, and his associate, Dr. Woodbury diagnosed spondylolisthesis, degenerative cervical disc disease, and/or myofascial pain syndrome involving the soft tissues at the base of the neck. (Tr. 141-144).

In February 2003, Dr. Brown referred Ross to Dr. John Ledbetter for pain management. (Tr. 140). Upon initial examination in March 2003, Dr. Ledbetter's office diagnosed *inter alia*, chronic neck and lower back pain, and mild depression, with possible symptom amplification. (Tr. 184-185). Following various trigger point injections, Dr. Ledbetter's officer referred Ross back to Dr. Brown in June 2003. (Tr. 170-171). On June 23, 2003, Dr. Brown urged Ross to seek disability. (Tr. 138-139). He assigned her a 20 percent permanent impairment for the body as a whole, and released her from his care. *Id*.

By November 2003, Dr. Ledbetter felt that Ross was at maximum medical improvement, and recommended that she consider returning to work at the sedentary-light level, in accordance with a functional capacity evaluation ("FCE"). (Tr. 166-167).[5]

Ross did not return to work, however. Between November 2003 and November 2004, she developed carpal tunnel syndrome. (Tr. 160-161). During this one year period, she saw Drs. Ledbetter and Brown on approximately three occasions each. (Tr. 133-139, 160-165). On November 11, 2004, Dr. Ledbetter referred Ross to David Williams, Ph.D., for consideration of therapy for her ongoing situational depression related to her chronic pain. (Tr. 160-161).

Over a three day period, December 1, 7, and 15, 2004, David J. Williams, Ph.D., conducted a psychological evaluation of Ross. (Tr. 145-149). During the evaluation, Ross

---

[5] The FCE does not appear in the record.

6

acknowledged that she used marijuana as often as she could because it helped to ease her pain. *Id*. She denied experiencing any depressive symptoms or significant mental health problems prior to her injury. *Id*. She reported seeing auras around others when she was severely depressed. *Id*. Her immediate and long term memory remained intact. *Id*. However, her intermediate memory was poor. *Id*. She was able to interact appropriately on a 1:1 basis. *Id*. Social judgment was adequate. *Id*. She was able to manage household chores, recognize safety hazards, utilize public transportation, manage her own finances, and read and write with adequate facility. *Id*. Activities of daily living included caring for her animals, making her bed, cleaning up the house, shopping, and watching television. *Id*. Concentration, persistence, and pace were adequate. *Id*. Williams noted that she had a significant psychological overlay to her pain complaints. *Id*. She demonstrated some magnification of somatic symptoms. *Id*. However, her psychological test scores indicated that her symptom magnification was because of *unconscious processes rather than an overt attempt to malinger*. *Id*. She was experiencing a significant level of suicidal ideation. *Id*. Williams diagnosed major depressive disorder, recurrent with psychotic features; pain disorder caused by a general medical condition with psychological features; cannabis abuse; and personality disorder, NOS, with dependent and borderline traits. *Id*. He assigned a current GAF of 43. *Id*. He opined that Ross was not a good candidate for invasive medical procedures given the degree of psychological overlay to her pain. *Id*.

From December 2004 through at least May 2006, Ross participated in group therapy sessions with Dr. Williams. (Tr. 235-290).

In February 2005, Dr. Ledbetter memorialized a conversation with Ross's rehabilitation case manager wherein he stated that Ross was approaching maximum medical improvement from a physical standpoint, but not psychologically. (Tr. 291-292). He noted that Dr. Williams had determined that she suffered significant depression and a somatization process that affected

7

her perception of pain and limited her function. *Id*. Ledbetter thought that she needed to continue psychological counseling. *Id*. Ross returned to Dr. Ledbetter a few times in 2005, before telling him in January 2006 that she had settled her worker's compensation claim, and intended to apply for Medicare and Medicaid benefits. (Tr. 152-159). Ross initiated the instant disability process in January 2006.

In connection with her disability applications, the state agency scheduled some consultative examinations for Ross. On April 8, 2006, Mohammad Burney, M.D., examined Ross at the request of Disability Determination Services. (Tr. 186-192). During the examination, Ross complained of lower back pain and cervical spinal tenderness posteriorly. *Id*. She described radiation of pain down her bilateral lower extremities, with constant pain as a nine on a ten point scale. *Id*. She used a four-pronged cane because of multiple falls within the last few months. *Id*. Her cervical pain radiated into her heart. *Id*. She demonstrated an antalgic gait, but she could toe and heel walk. *Id*. She mounted and dismounted the table without difficulty. *Id*.

Burney concluded that Ross had significant emotional undertones and symptom magnification because he observed her stooping to pick up objects from the floor in the waiting room, despite her later refusal to flex her lumbar spine past 30 degrees during examination. *Id*. She demonstrated a decent grip strength, despite voluntary restrictions. *Id*. She refused passive range of motion in the cervical spine. *Id*. Burney saw no obvious evidence of muscular atrophy. *Id*. Straight leg raise was negative. *Id*. He diagnosed mild to moderate degenerative arthropathy, with no evidence of radiculopathy or myelopathy in either the cervical or the lumbar spinal region. *Id*. He further noted that she had significant symptom magnification, and that she was undergoing psychiatric treatment. *Id*.

On May 22, 2006, Ross underwent a psychological examination with Elsie Gordon, Ph.D.

8

(Tr. 193-195). During the examination, Ross's understanding appeared intact, and she was able to follow simple two and three step instructions. *Id*. Overall, her concentration, pace, persistence, social interaction, and insight were adequate. *Id*. Adaptation appeared minimally adequate. *Id*. She took care of her own personal hygiene, and did not need to be reminded to take medication. *Id*. Gordon diagnosed major depressive disorder, with the need to rule out psychotic features, and panic disorder, without agoraphobia. *Id*.

On June 29, 2006, a non-examining agency physician, Tom Ray, Ph.D. signed a Mental Residual Functional Capacity Assessment wherein he indicated that plaintiff suffered moderate limitations in her ability to accept instructions and to respond appropriately to criticism or to changes in the work setting. (Tr. 209-212).[6]

In the aftermath of the unfavorable agency decision, Dr. Williams completed a psychological impairment questionnaire on July 26, 2006, presumably at the behest of Ross's representative. (Tr. 226-234). Williams wrote that Ross's ability to adapt to stress was moderately or significantly limited by pain and personality disorder. *Id*. He opined that her ability to maintain consistent work was significantly limited. *Id*. Persistence was moderately limited. *Id*. Pace was mildly to moderately limited. *Id*. Memory was not limited. *Id*. Sustained concentration was mildly to moderately limited by pain preoccupation. *Id*. Her personality disorder would not resolve within twelve months, and her prognosis was poor. *Id*. He assigned a GAF of 60, and indicated that she was at maximum medical improvement. *Id*.

Williams noted that Ross's primary symptoms were depression, paranoia, mood swings, somatization, and pain preoccupation. *Id*. He indicated that she had moderate limitations in her ability to maintain attention and concentration for extended periods, to interact appropriately with the general public, to get along with co-workers or peers without distracting them or exhibiting

---

[6] However, the form was actually completed by the disability examiner. *See* Tr. 213-214.

behavioral extremes.  *Id*.  He opined that she had marked limitations in her ability to perform activities within a schedule, maintain regular attendance, and to be punctual; to complete a normal workweek without interruptions from psychologically based symptoms; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to respond appropriately to changes in the work setting.  *Id*.  Williams noted that she was likely to miss work more than three times per month.  *Id*.  He did not suspect malingering.  *Id*.

Following Ross's initial hearing before the ALJ, the state agency obtained another consultative mental status examination, presumably at the request of the ALJ, with none other than her treating psychologist, David Williams.  (Tr. 293-296).  At the May 7, 2007, examination, Ross told Dr. Williams that she had not smoked marijuana in over six weeks.  *Id*.  She said that she did as little as possible in an average day.  *Id*.  She described panic attacks at a frequency of two or three per week.  *Id*.  Overall, her social interaction was marginal, and her social judgment was adequate.  *Id*.  Concentration and persistence were significantly limited by depression.  *Id*.  Pace was slow.  *Id*.

Williams diagnosed major depressive disorder, recurrent, with no sign of current psychotic features; pain disorder; cannabis dependence; anxiety disorder; and personality disorder.  *Id*.  He assigned a current GAF of 38.  *Id*.  Williams opined that there was a "very small chance of her ever returning to work due to the confluence of pain, depression, and personality disorder."  *Id*.  He believed that Ross had accepted the "sick role."  *Id*.  Her ability to adapt to stress was significantly to extremely limited by the confluence of pain and depression.  *Id*.

Williams also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  (Tr. 297-299).  He indicated that her ability to understand, remember, and

carry out instructions was no more than mildly impaired. *Id*. Her ability to interact appropriately with the public, supervisors, and co-workers was moderately impaired. *Id*. Morever, her ability to respond appropriately to usual work situations and to changes in a routine work setting was marked to extremely limited. *Id*.

On July 3, 2007, the ALJ propounded various interrogatories to Barbara Felkins, a board-certified psychiatrist. (Tr. 300). Dr. Felkins responded to the interrogatories on July 12, 2007. (Tr. 301-305). She indicated that Ross suffered from major depression; personality disorder; generalized anxiety disorder; panic disorder; carpal tunnel syndrome; myofascial pain syndrome; spondylosis, cervical and lumbar; and possible somatization. *Id*. She stated that she disagreed with the treating psychologist. *Id*.

Felkins also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). (Tr. 306-308). She indicated that Ross had marked limitations in her ability to understand, remember, and carry out complex instructions; and to make judgments on complex work-related decisions. *Id*. Ross also experienced moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. *Id*.

b)   Discussion

At the two hearings held in this matter, the ALJ took administrative notice that were he to credit the limitations recognized by Ross's treating psychologist, Dr. Williams, as set forth in his July 26, 2006, questionnaire, Ross would not be capable of meaningful work activity. (Tr. 455, 472).[7] Ordinarily, of course, a treating physician's opinion on the nature and severity of a

---

[7] The ALJ did not attempt to reconcile the limitations recognized by Dr. Williams in the July 26, 2006, questionnaire with the limitations he imposed following the May 7, 2007, consultative examination.

patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted). However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See, Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

In this case, the ALJ concluded that Dr. Williams' diagnoses (and apparently, his assigned limitations) were not supported by the record. In so doing, the ALJ remarked that sometimes a treating doctor is motivated to assist his or her patient. (Tr. 26-27). While that may be so, there is no evidence to confirm such a suspicion in this case. In fact, the state agency sent Ross to Dr. Williams for a consultative examination, which suggests that ordinarily, they deem him a reliable and impartial medical source.

The only evidence identified by the ALJ that contradicted Dr. Williams' assessment was the opinion of the non-examining medical expert, Dr. Felkins. However, a contradictory report by a non-examining physician does not provide good cause to disregard the opinion of the treating physician or psychologist. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (citation omitted). Further, it is manifest that the ALJ ultimately assigned greatest weight to Dr. Felkins' opinion. (Tr. 27). Yet, "an ALJ may properly rely on a non-examining physician's assessment when ... those findings are based upon a careful evaluation of the medical evidence and *do not contradict those of the examining physician*." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting, *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990)) (emphasis added).[8]

---

[8] The Fifth Circuit cited *Lamb v. Bowen* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining

Here, Dr. Felkins' findings clearly contradict the findings of plaintiff's treating psychologist, and thus do not provide substantial support for the ALJ's determination.[9] Once Dr. Felkins' opinion is removed from consideration, the record otherwise remains devoid of substantial evidence to support the ALJ's residual functional capacity assessment.[10]

### III. Step Five and Remand

Because the foundation for the Commissioner's Step Five determination was premised upon a residual functional capacity that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, is likewise not supported by substantial evidence.[11]

Plaintiff urges the court to enter a judgment awarding benefits. The courts have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

---

physician." *Villa, supra* (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

[9] Dr. Felkins' findings are not necessarily inconsistent with the findings of the state agency's examining physician, Dr. Gordon. However, this was also true in *Carrier*, where the court found that the ALJ's decision was supported by substantial evidence because he adopted only those portions of the non-examining physician's opinion that did not conflict with the findings of "*any* treating physician." *Carrier*, 944 F.2d at 246 (emphasis added). Also, in *Villa v. Sullivan*, the Fifth Circuit found that the ALJ properly relied upon the non-examining physician's opinion where the examining physician "*specifically found* that his examination did not confirm [the claimant's] complaints and that the [impairment] did not cause extreme functional limitations." *Villa*, 895 F.2d at 1023-1024 (emphasis added). No examining physician, including Dr. Gordon, has issued comparable findings in this case.

[10] That is not to say that upon remand the ALJ is obliged to credit the limitations recognized by plaintiff's treating psychologist. Further development may provide valid grounds for discounting the opinion. For instance, the ALJ may employ a psychologist or psychiatrist who may *examine* plaintiff, review her extensive treatment records, and then provide well-reasoned assessments of the limitations imposed by her impairment(s). Of course, the ALJ would still have to provide valid grounds for crediting the opinion of the consultative psychologist over the findings of plaintiff's treating psychologist.

[11] The court need not reach plaintiff's remaining assignment(s) of error; they may be addressed upon remand.

reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits. *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits). The instant record is not so disposed. Plaintiff's residual functional capacity assessment remains indeterminate.

For the foregoing reasons,

The Commissioner's decision is **REVERSED**, and the matter **REMANDED** for further proceedings in accordance with this opinion.

THUS DONE AND SIGNED at Monroe, Louisiana, this 8th day of July 2010.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE